UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| ANTHONY W. REED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:16-cv-00319-WTL-DLP |
| | ) | |
| MARK J. BOWEN, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**Entry Granting Defendants' Motion for Summary Judgment
and Directing Entry of Final Judgment**

**I. Introduction**

Plaintiff Anthony W. Reed is currently incarcerated at the Putnamville Correctional Facility. He filed a civil rights complaint based on the conditions he experienced while he was incarcerated at the Hamilton County Jail (Jail) in Noblesville, Indiana. The Court screened his complaint and determined that Mr. Reed adequately stated an Eighth Amendment conditions of confinement claim against defendants Mark Bowen and Jason Sloderbeck and a retaliation claim against defendant J. Miller.

Presently pending before the Court is the defendants' motion for summary judgment filed on October 30, 2017. Dkt. No. 57. This motion is now fully briefed. This Entry also resolves two other ancillary motions. Dkt. No. 85; Dkt. No. 87.

The defendants' motion argues that Mr. Reed's constitutional claims are without merit. Mr. Reed's response argues that the defendants are not entitled to summary judgment. For the reasons set forth below, the defendants' motion for summary judgment, Dkt. No. 57, is granted.

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *Harney v. Speedway Super America, LLC.*, 526 F.3d 1099, 1104 (7th Cir. 2008). The non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

Local Rule 56-1(b) requires a non-movant to include a section labeled "Statement of Material Facts in Dispute" that identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment. While Mr. Reed included a section labeled "Statement of Material Facts in Dispute" that is the only way he complied with the Local Rule. His "Statement" does not include any potentially determinative

facts. Rather, it is a three page document that restates each legal claim. For example, Mr. Reed includes the following paragraph as a "fact":

> 2. Whether the plaintiff by informing defendant Miller and, other Hamilton County Jail officers present that he intended to file his legal action claim over the adverse confine, conditions imposed upon him, on the morning of January 23, 2015, as he (the plaintiff) was being booked out of the Hamilton County Jail, was sufficient enough, couple with the genuine issue of material fact alleged in paragraph 1 to also, placed the defendants on "Notice" of the plaintiff 's intention to seek legal action against the defendants.

Dkt. No. 87.

Further, the declaration under penalties of perjury that Mr. Reed provided as evidence contains primarily allegations or conclusory statements, but does not set out specific facts showing a genuine issue for trial. Dkt. No. 86. Although pro se filings are construed liberally, pro se litigants such as Mr. Reed are not exempt from procedural rules. *See Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) (noting that "pro se litigants are not excused from compliance with procedural rules"); *Members v. Paige*, 140 F.3d 699, 702 (7th Cir. 1998) (stating that procedural rules "apply to uncounseled litigants and must be enforced").

### III. Statement of Material Facts Not in Dispute

The following statement of facts was evaluated pursuant to the standard set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to Mr. Reed as the non-moving party with respect to the motion for summary judgment. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## A. Background

Mr. Reed, as a pre-trial detainee, was incarcerated at the Jail in 2014 and 2015. In 2014, there were 256 general population beds at the Jail for males. Dkt. No. 58-2, p. 24. In 2015, there were 218 general population beds at the Jail for males. Dkt. No. 58-2, p. 42. During this time, the average daily male inmate population was 246 and 238, respectively. Dkt. No. 58-2, pp. 26, 44. Defendant Captain Sloderbeck has been the Jail Commander at the Jail for the last seven years. Dkt. No. 58-2, ¶ 1. Defendant Mark Bowen is the Hamilton County Sheriff.

Mr. Reed filed a civil rights complaint that alleged Eighth Amendment violations based on being triple-bunked, being confined in his cell for 20 hours per day, and being exposed to inadequate cleaning supplies that caused an intense itching to his face. Mr. Reed also alleged that Officer Miller retaliated against him by throwing his legal papers away after he threatened to file a lawsuit about the conditions at the Jail. The defendants argue that they are entitled to judgment as a matter of law because Mr. Reed's Eighth Amendment rights were not violated. Defendant Miller argues that Mr. Reed's First Amendment rights were not violated because he did not retaliate against him.

## B. Eighth Amendment Claim

### 1. Security Status

The goal of the Jail's classification system is to provide for the safety and protection of all of the Jail's pretrial detainees and inmates. Dkt. No. 58-3, ¶ 3. The Jail seeks to accomplish this goal by housing like-kind offenders together, meaning that minimum security inmates are housed with other minimum security inmates, medium security inmates are housed with other medium security inmates, and maximum security inmates are housed with other maximum security inmates. Dkt. No. 58-3, ¶ 3. Jail officers do not have the discretion to place inmates outside

of their known security status. Dkt. No. 58-3, ¶ 4. The security status of each inmate is determined by the Jail officers based on information known to them. Dkt. No. 58-3, ¶ 5. Such information includes information available to them on the Jail's New World Computer System and personal interactions Jail officers have with individual inmates. Dkt. No. 58-3, ¶ 5. The New World Computer System uses Northpointe, Inc. which is used by jails and correctional facilities throughout the country. Northpointe uses a "classification tree" system. Dkt. No. 58-3, p. 4. This classification tree system categorizes security placement based on an inmate's past and current charges, whether there are any current holds for an inmate, an inmate's disciplinary history, and an inmate's residency. Dkt. No. 58-3, ¶¶ 7, 8. Based on the answers to these questions, Northpointe determines the security status of an inmate.

### 2. Triple-Cell

An inmate may be placed in a cell with two other inmates (in a cell designed for two inmates), which is described by some as triple-celling. This occurs in two situations: 1) when there is no empty cell available for the inmate (which is generally the case given the Jail's inmate population); or 2) there is no open bunk available for the inmate with other inmates who have the same classification (i.e., inmates cannot be placed with other inmates with a higher or lower classification). Placing three inmates in a two person cell is done because it is less risky than placing the inmate with an inmate of a different classification level. Dkt. No. 58-3, ¶ 9. When inmates are triple-celled, two (2) of the inmates sleep in the bunks and the third inmate sleeps on a mattress on the floor. Dkt. No. 58-1, p. 74; Dkt. No. 86, p. 14.

While Mr. Reed was incarcerated at the Jail, he was housed in cells 404, 425, 427, and 429. In cell 404, each inmate had 15.69 square feet of space. In cell 425, each inmate had 17.86 square feet of space. In cell 427, each inmate had 17.40 square feet of space. In cell 429, each inmate had

16.80 square feet of space.[1] Dkt. No. 58-2, pp. 114-120.

From December of 2014 through April of 2015, Jail officers allowed inmates out of their cells for up to four hours per day. Dkt. No. 58-2, ¶ 14.

During the relevant times at issues in this action, Mr. Reed was triple-celled on many occasions. In the early morning hours of December 18, 2014, Mr. Reed was triple-celled in cell 404 where he remained for eleven days until December 29, 2014. Dkt. No. 58-3, ¶ 11; Dkt. No. 58-3, p. 5.

In the evening hours of December 29, 2014, Mr. Reed was moved to cell 427 and remained there until December 31, 2014. During this two day period, Mr. Reed was triple-celled. Dkt. No. 58-3, ¶ 12; Dkt. No. 58-3, p. 6.

From January 6, 2015 to January 10, 2015, Mr. Reed was triple-celled in cell 425. From January 12, 2015, at 4:30 p.m. though January 14, 2015, at 12:11 a.m. (one day and eight hours) Mr. Reed was triple-celled in cell 425. Thereafter, for a week, from January 16, 2015, until January 23, 2015, Mr. Reed was also triple-celled. Dkt. No. 58-3, ¶ 13; Dkt. No. 58-3, p. 8.

Mr. Reed returned to the Hamilton County Jail in mid-March of 2015.[2] He was again triple-celled in cell 425 through March 19, 2015. Dkt. No. 58-3, ¶ 14; Dkt. No. 58-3, p. 9.

In the early morning hours of March 19, 2015, Mr. Reed was placed in cell 429. While Mr. Reed remained in this cell until April 17, 2015, he was only triple-celled for portions of this period of his incarceration. Specifically, Mr. Reed was triple-celled from March 20, 2015, to March 23,

---

[1] It appears the Jail Commander made a typo in the evidence concerning square footage. The evidence lists the square foot space for cell 425 two times, but does not include the space for cell 427. *See* Dkt. No. 58-2, p. 119. The Court assumes the Court intended for the second cell 425 space to state it was the square footage for cell 427. The same error occurred for cell 429. Dkt. No. 58-2, p. 120.

[2] The record does not indicate where Mr. Reed was from the end of January of 2015 through March 12, 2015.

2015, from March 27, 2015, to March 30, 2015, and from April 1, 2015 to April 15, 2015. Dkt. No. 58-3, ¶ 15; Dkt. No. 58-3, pp. 11-12.

In summary, Mr. Reed was triple-celled at the Hamilton County Jail, in cells 404, 425, 427 and 429, for a total of approximately 51 days. Dkt. No. 58-3, ¶ 16.4. These days were not consecutive.

### 3. Conditions at the Jail

Indiana's State Jail Inspector performed an audit of the Jail in 2014 and 2015 and made the following determinations:

- the cubic feet per minute of air flow movement on the date of inspection was 256.5 to 443 c/f/m in 2014 and 256.5 to 443 c/f/m (on the date of inspection)

- the cell temperatures at the time of the inspection were 71-72 degrees Fahrenheit in 2014 and 73.3 degrees Fahrenheit in 2015,

- there was hot and cold running water in each cell,

- inmates had access to toilets,

- cleaning supplies/equipment were available to inmates daily,

- the Jail's plumbing fixtures were functional,

- the Jail was inspected on a weekly basis by a designated official,

- weekly insect and rodent inspections occurred at the Jail,

- the Board of Health conducted annual inspections of the Jail,

- the Jail had a written policy concerning safety, sanitation and supply control,

- inmates were provided with bar soap, toothpaste and a toothbrush,

- inmates were "afforded the opportunity to shower at least three (3) times within every seven (7) days,"

- there was a licensed physician responsible for medical screening,

- inmates' medical complaints were collected daily and responded to by medically-trained personnel,

- indoor and outdoor physical exercise was available,

- there was a written plan for classification of inmates, and

- the facility was clean.

Dkt. No. 58-2, pp. 74-104.

In 2015, a company known as Micro Air, Inc., which "is fully accredited for spore trap analysis by the American Industrial Hygiene Association[,]" conducted indoor air quality testing in several locations within the Hamilton County Jail. Dkt. No. 58-2, ¶¶ 8-9. Specifically, on April 14, 2015, Micro Air, Inc. conducted indoor air quality testing the results of which were described in detail in Micro Air, Inc.'s April 17, 2015, letter, as follows:

> Microbiological air sampling revealed low total airborne mold spore levels in all areas tested that were also significantly below the outdoor level measured. The concentrations measured were not at a level of concern on the day the sampling was conducted.

> Carbon dioxide monitoring revealed levels that were within the recommended range for a normal indoor air environment in all areas tested. This suggests that a sufficient amount of fresh air is being introduced into the building.

> No carbon monoxide was detected within the sampling areas during the investigation. This is an indication that exhausts from combustion sources are not entering and accumulating in the areas sampled.

> Temperature levels measured inside the building were within the recommended range for thermal comfort at the time of sampling in all locations. Relative humidity levels measured in all of the sampling areas were within the recommended range for thermal comfort on the date the sampling was conducted.

Dkt. No. 58-2, ¶ 9; Dkt. No. 58-2, pp. 105-112.

While Micro Air, Inc.'s April 17, 2015, letter noted that relative humidity levels above the

recommended range "can promote mold growth[,]" the results of Micro Air, Inc.'s testing confirmed that the relative humidity levels in the Hamilton County Jail "were within" (i.e., they were not above) the recommended range. Dkt. No. 58-2, ¶ 9; Dkt. No. 58-2, p. 111.

Additionally, on at least one occasion during the 2014-2015 time period all of the Jail's cleaning vents were cleaned and dust was removed. Dkt. No. 58-2, ¶ 12.

During the 2014-2015 time period, cleaning agents which were used by inmates and detainees to clean their cells were diluted, per manufacturer requirements and the instructions that were contained in the Material Safety Data Sheets prior to being provided to inmates or detainees. Captain Sloderbeck has personally witnessed the use of these diluted cleaning agents and found them to be effective in cleaning inmates' and detainees' cells and other areas of the Jail. Dkt. No. 58-2, ¶ 11.

The Jail's Annual Jail Reports for 2013 through 2015 collect in one place data regarding the top ten inmate medical expenses each year. Skin rashes and other types of dermatitis are not a top ten complaint by inmates and were not a problem reported by a significant number of inmates and detainees at the Jail during the 2014 to 2015 time period. Dkt. No. 58-2, p. 2, ¶ 7; Dkt. No. 58-2, pp. 5-59.

**C. Retaliation Claim**

During the early morning of January 23, 2015, Transportation Officer Jacob W. Miller transported Mr. Reed in the Hamilton County Sheriff's Departments's transport van from the Jail to the Branchville Correctional Facility (Branchville). Dkt. No. 58-5, ¶¶ 1, 3-4. Immediately before Mr. Reed was transported from the Jail to Branchville, he told Officer Miller (and an unidentified white officer who inventoried Mr. Reed's property) that he intended to file the "legal action claim" that he (Mr. Reed) had already completed/drafted regarding the conditions

of confinement that he (Mr. Reed) was allegedly forced to endure at the Jail. Dkt. No. 58-1; p. 6. Officer Miller responded, "[w]e don't care. Go ahead and do what you gotta do." Dkt. No. 58-1; pp. 6-7. Mr. Reed does not believe he has had any prior conversations with Officer Miller or that Officer Miller said anything more in response to Mr. Reed's statement that he was going to sue the Jail. Dkt. No. 58-1, p. 7.

When he got into the transportation van, he was the only passenger, besides the driver, and he sat at the back by the window. Dkt. No. 58-1, p. 8. Mr. Reed had with him a red envelope and a manila envelope full of legal papers. He also had a large plastic bag which contained commissary items, his legal papers and other personal property (including photographs of Mr. Reed's deceased sister). Dkt. No. 58-1, pp. 9-13. Officer Miller placed Mr. Reed's personal property in the front seat of the van. Dkt. No. 58-1, p. 13.

Mr. Reed got into the left-side of the transportation van that is divided into two sides.



Exterior door of van — Passenger view



Dkt. No. 58-5, pp. 2-3. From the left side, Mr. Reed could only see out the back window through the holes in the metal. There are no other windows accessible in the back of the transportation van. Dkt. No. 58-1, p. 147.



Dkt. No. 58-5, p. 3.

After Mr. Reed and Officer Miller left the jail, Officer Miller drove the transport van into the garage under the Hamilton County courthouse. Dkt. No. 58-1, pp. 9, 14. The van stopped for two or three seconds and then Mr. Reed saw a man standing by the van with a bag similar to the bag containing his personal items. Dkt. No. 58-1, p. 14. The van then left the garage and headed to Branchville.

At Branchville, Officer Miller escorted Mr. Reed through the intake process. Officer Miller

did not have Mr. Reed's bag of personal items, including the envelopes, with him during the intake process. After eating lunch at Branchville, Mr. Reed asked Property Officer Cassidy where his property was. Dkt. No. 58-1, p. 16. Mr. Reed was told he did not have any property at Branchville. Dkt. No. 58-1, p. 15.

Officer Miller returned to the Jail the same day. Dkt. No. 58-5. At the Jail, he discovered that he forgot to drop off the envelope containing Mr. Reed's documents/papers and/or possessions. Dkt. No. 58-5, ¶ 8. Officer Miller mailed the envelope to Mr. Reed at Branchville that day. Dkt. No. 58-5, ¶ 9. Specifically, Officer Miller hand-addressed a mailing label (which already contained the Sheriff's Department's return address) to Branchville Correctional Facility Release Coordinator Tami Polster, and placed the addressed sealed envelope in the Sheriff's Department's/Jail's outgoing mail bin. Dkt. No. 58-5, ¶ 9. Officer Miller subsequently made three to four telephone calls to Branchville to determine whether the facility received Mr. Reed's small envelope. Dkt. No. 58-5, ¶ 10. Officer Miller spoke to Ms. Polster who informed him on each occasion that the small envelope had not yet been delivered to Branchville. Dkt. No. 58-5, ¶ 10.

## IV. Discussion

### 1. Eighth Amendment-Conditions of Confinement[3]

Mr. Reed's constitutional rights as a pretrial detainee are derived from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which is applicable to convicted prisoners. *See, e.g., Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 2475

---

[3] Mr. Reed argues in his response to summary judgment that the defendants failed to treat his medical complaints of intense facial itching that was allegedly caused by the dirty conditions at the Jail. Dkt. No. 89, pp. 7, 33. However, Mr. Reed's amended complaint, Dkt. Nos. 8, 9, did not assert an Eighth Amendment claim for deliberate indifference of a serious medical need. He is not permitted to raise this claim for the first time at this stage of the proceedings. *Anderson v. Donahoe*, 699 F.3d 989, 997-98 (7th Cir. 2012) (explaining that claims not alleged in a plaintiff's complaint are waived . . . .).

(2015); *Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013). In the context of a conditions of confinement claim, a pretrial detainee is entitled to be free from conditions that amount to "punishment," *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), while a convicted prisoner is entitled to be free from conditions that constitute "cruel and unusual punishment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In both cases, however, the alleged conditions must be objectively serious enough to amount to a constitutional deprivation, and the defendant prison official must possess a sufficiently culpable state of mind. *See, e.g., Sain v. Wood*, 512 F.3d 886, 893–94 (7th Cir. 2008). With respect to this second, subjective element, an inmate must "prove that the defendant 'possess[ed] a purposeful, a knowing, or possibly a reckless state of mind' with respect to the defendant's actions (or inaction) toward the plaintiff." *Davis v. Wessel*, 792 F.3d 793, 801 (7th Cir. 2015) (quoting *Kingsley*, 135 S.Ct. at 2472). An adverse condition amounts to a constitutional deprivation when it results in the denial of a basic human need, *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012), such as "adequate food, clothing, shelter, and medical care," *Farme*r, 511 U.S. at 832, 114 S.Ct. 1970.

Practically speaking, there is little difference, if any, between the standards applicable to pretrial detainees and convicted inmates when it comes to conditions of confinement claims, and such claims brought under the Fourteenth Amendment are appropriately analyzed under the Eighth Amendment test. *See, e.g., Smego v. Mitchell*, 723 F.3d 752, 756 (7th Cir. 2013) ("[T]he protection afforded under [the Due Process Clause] is functionally indistinguishable from the Eighth Amendment's protection for convicted prisoners.").

Mr. Reed's Fourteenth Amendment claim is asserted pursuant to 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the alleged deprivation was committed by a person

acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

Here, the first question is whether the condition alleged is sufficiently serious to invoke the constitution. Mr. Reed alleged a constitutional violation based on being triple-bunked, being confined in his cell 20 hours per day, and being exposed to inadequate cleaning supplies that allowed the dirt to accumulate which caused an intense itching to his face.

The defining Supreme Court case addressing the issue of overcrowding is *Rhodes v. Chapman*, 452 U.S. 337 (1981). In that case, the plaintiffs contended that the lodging of two inmates in a single cell ("double celling") constituted cruel and unusual punishment. The Supreme Court disagreed, concluding that "[a]t most ... double celling inflicts pain," *id*. at 348-49, but not the "unnecessary and wanton infliction of pain" that violates the Eighth Amendment. *Id*. at 346. The Court found that the Constitution "does not mandate comfortable prisons," *id*. at 349, and only those deprivations denying "the minimal civilized measure of life's necessities," *id*. at 347, are sufficiently grave to form the basis of an Eighth Amendment violation. In reaching this conclusion, the Court stated,

> Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment.... But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

*Id*. at 347; *see also Wilson v. Seiter*, 501 U.S. 294 (1991).

The amount of space per inmate has some relevance when evaluating whether the totality of the conditions of confinement may amount to a serious deprivation of basic human needs. *See Madyun v. Thompson*, 657 F.2d 868, 874 (7th Cir. 1981). A constitutional claim may arise if overcrowding causes other significant deprivations, such as inadequate medical or mental health care. *See Brown v. Plata*, 563 U.S. 493 (2011) (California prison system was required to reduce

inmate population as part of remedial plan to correct constitutional deficiencies in medical and mental health care).

Similarly, in an unpublished opinion, the Seventh Circuit found that a complaint over triple-celling in Federal Correctional Institution–Greenville failed to state a constitutional claim, where the plaintiff did not connect any deprivation of "basic human needs" or "the minimal civilized measure of life's necessities" to the crowded conditions, *McCree v. Sherrod*, 408 Fed.Appx. 990, 992 (7th Cir. 2011) (citing *Rhodes*, 452 U.S. at 347)).

Here, the undisputed evidence shows that the inmates were triple-celled in two situations: 1) when there was no empty cell available for the inmate; or 2) when there was no open bunk available for the inmate with other inmates of the same security classification.[4] The Jail has determined that placing three inmates in a two person cell is less risky that placing an inmate in a cell with an inmate that has a different security classification. During his stay at the Jail, Mr. Reed was triple-celled a total of 51, non-consecutive days. In each cell Mr. Reed was triple-celled in at the Jail, each inmate had between 15 to 17 square feet of space and spent approximately 20 hours per day in their cell.

The Court is unaware of any standards that mandate a minimum square foot area that must be provided for each inmate, and Mr. Reed has not pointed to any relevant cases.[5] Even if such

---

[4] In his declaration, Mr. Reed points to the fact that he was moved into a cell with only one other inmate from a cell with two other inmates after he submitted an inmate request form, Dkt. No. 86, ¶ 4; Dkt. No. 88-1, p. 13; Dkt. No. 89, p. 9, as proof the Jail does not house the inmates according to their classification. However, this is not evidence of that fact because Mr. Reed does not provide any evidence that the single inmate in the cell he was moved into was a different classification as him.

[5] In his declaration, Mr. Reed states that he filed several grievances concerning the conditions of his confinement. Dkt. No. 86, p. 13; Dkt. No. 88-1, p. 1. However, a grievance only shows that Mr. Reed complained about what he perceived to be inadequate conditions. A grievance or complaint itself about allegedly inadequate conditions does not prove an Eighth Amendment violation. Rather, the conditions complained of have to violate the Eighth Amendment.

guidelines existed, the failure to provide a minimum cell space required by state law or an administrative code does not, without more, amount to a violation of the Eighth Amendment.

Based on this evidence, the Court finds that triple-celling at the Jail is not *per se* unconstitutional. Thus, the question becomes whether being detained for 20 hours per day for only 51, non-consecutive days with alleged inadequate cleaning supplies that caused intense face itching that Mr. Reed suffered and attributed to the over-crowding, is a deprivation of a basic human need or the minimal civilized measure of life's necessities. To make this determination the Court must examine the totality of the conditions of confinement. *Madyun v. Thompson*, 657 F.2d 868, 874 (7th Cir. 1981).

The Indiana State Jail Inspector performed an audit of the Jail in 2014 and 2015. The audit found, among other things, that each cell had hot and cold water, inmates had access to toilets, the air temperature was appropriate, the Jail was inspected on a weekly basis, weekly insect and rodent inspections occurred, inmates received bar soap, toothpaste and a toothbrush, the inmates showered three times per week, and the facility was clean. Moreover, an outside company, Micro Air, Inc., conducted indoor air quality testing in 2015 at the Jail and found that the humidity levels at the Jail were within normal range as not to promote mold growth. Finally, the undisputed evidence shows that on at least one occasion in 2014-2015, all of the Jail's vents were cleaned and the dust was removed. Based on the totality of this undisputed evidence, the conditions at the Jail did not amount to a deprivation of a basic human need or the minimal civilized measure of life's necessities.

Mr. Reed alleges he developed a rash on this face that caused intense itching as a result of the dirty dusty conditions at the Jail and the fact the cleaning supplies were diluted. The only evidence he has to support this claim is that when he was let out of his cell, the itching went away.

Mr. Reed admitted that he had no scientific evidence showing that the alleged ineffectiveness of the diluted cleaning supplies caused his skin to itch. Dkt. No. 58-1, pp. 24-25. Moreover, Mr. Reed admitted he has no direct knowledge that the cleaning supplies were diluted. Dkt. No. 58-1, p. 22. He based his assertion that they were diluted on the fact that he saw the cleaning supplies mixed with water and from this he opined they were too diluted to be effective. Dkt. No. 58-1, pp. 23-24. The defendants' evidence shows that the cleaning supplies were diluted consistent with the manufacturer's instructions. Further, Mr. Reed has not directed the Court to any designated evidence that would permit an inference that his face rash was caused by diluted cleaning products.

Prisons need not be completely sanitized or as clean as one's home would be. *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998). The undisputed evidence is that the air quality at the Jail was satisfactory, the Jail was clean, the air vents were cleaned as necessary, and the cleaning supplies were effective.

In his declaration, Mr. Reed states that during the period he was triple-celled he was only allowed out of his cell for four hours per day from 7:00 p.m. to 11:00 p.m. from December 18, 2014, to January 23, 2015, and then again in March and April of 2015. Dkt. No. 86. In *Bell*, 441 U.S. at 542, the Court recognized that "confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment . . . ." However, Mr. Reed's confinement in the Jail with two other inmates for 20 hours per day only occurred for approximately 51 non-consecutive days. While only allowing inmates out of their cells for four hours per day is not ideal, it is not a constitutional deprivation because it did not occur for an extended period of time due to the temporary nature of Mr. Reed's detention at the Jail.

Mr. Reed has not presented any evidence demonstrating that the Jail was unconstitutionally overcrowded during his period of incarceration or that the totality of the conditions amounted to punishment. Although the cells were often triple-bunked for safety purposes, there is no evidence that the occasional overcrowding (a total of 51 non-consecutive days for Mr. Reed) for 20 hours per day left him with inadequate living space or otherwise adversely affected his health or safety. Mr. Reed's claim is defeated by the indicators of cleanliness offered by the defendants.[6] There is also no evidence the defendants possessed a reckless state of mind.

The defendants' motion for summary judgment is granted with respect to Mr. Reed's conditions of confinement claim.

### 2. First Amendment-Retaliation[7]

Mr. Reed claims that Officer Miller retaliated against him by throwing his legal papers

---

[6] There are no records in Mr. Reed's Jail medical file submitted by the defendants which confirm that he complained of intense facial itching. Dkt. No. 58-2, pp. 123-78. However, Mr. Reed states he did file grievances and/or complaints that he needed to be seen by medical to address the issues he alleges he was having from the dirty conditions at the Jail. Dkt. No. 86, pp. 17-18; Dkt. No. 88-1, p. 23. However, his request for medical attention is only evidence of the fact that he complained that the alleged dirty conditions were causing him to have a physical reaction.

[7] Mr. Reed argues that the defendants retaliated against him for threatening to file a lawsuit about the condition of the Jail by falsely reporting to the Indiana Department of Correction Reception and Diagnostic Center that he was a trouble-maker on April 17, 2015. Dkt. No. 89, pp. 49-50; Dkt. No. 88-1, p. 25. This resulted in Mr. Reed being placed in administrative restricting housing at the Reception and Diagnostic Center. Dkt. No. 88-1, p. 25. However, Mr. Reed's retaliation claim is limited to the events that occurred on January 23, 2015, because those are the only facts he included in his amended complaint. *Anderson*, 699 F.3d at 997-98.

away after he threatened to file a lawsuit about the conditions at the Jail.[8] [9] He contends that such actions violated his rights pursuant to the First Amendment. To prevail on a First Amendment retaliation claim, a plaintiff must prove that: 1) he engaged in protected activity; 2) he was subjected to adverse actions by a state actor; and 3) the protected activity was a motivating factor in the state actor's decision to take adverse action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009); *see Mays v. Springborn*, 719 F.3d 631, 635 (7th Cir. 2013). "A prisoner has a First Amendment right to make grievances about conditions of confinement." *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012). Here, however, Mr. Reed did not allege that Officer Miller retaliated against him after he filed a lawsuit or grievance. Rather, he *threatened* to file a lawsuit, which is arguably not a constitutionally protected activity. *Bridges v. Gilbert*, 557 F.3d 541 (7th Cir. 2009) (stating that even if a threat to file a grievance were protected activity . . . .); *see Hanna v. Maxwell*, 415 Fed. Appx. 533 (5th Cir. March 3, 2011) (stating that an allegation of retaliation for threatening to file a lawsuit during a confrontation with corrections officers fails to state a claim); *Jones v. Book*, 404 Fed. Appx. 169 (9th Cir. Nov. 22, 2010) (stating that officers reasonably interpreted a prisoner's threat to file a lawsuit as not protected by the First Amendment).

Even if threatening to file a lawsuit were protected activity, Mr. Reed has not presented any admissible evidence that any action taken by Officer Miller was motivated by such a threat.

---

[8] Mr. Reed states that Officer Miller stopped the transportation van in the underground garage of the Hamilton County Courthouse and gave a plastic bag to another man. However, in his affidavit, Mr. Reed stated that Officer Miller "hand[ed] a person what appeared to be a (my?) large clear plastic bag with all my property items that were in it." Dkt. No. 86, p. 6. Mr. Reed's evidence that Officer Miller gave his possessions to someone else is pure speculation and even he questions its veracity as evidenced by the question mark in his statement.

[9] In his affidavit, Mr. Reed also asserts that his salty snack and access to the court claims against the defendants were dismissed because he did not have any supporting documents because Officer Miller disposed of his legal papers. However, the Court dismissed these claims because they were legally insufficient, not because they were factually insufficient. *See* Dkt. No. 6; Dkt. No. 9.

"A motivating factor is a factor that weighs in the defendant's decision to take the action complained of - in other words, it is a consideration present to his mind that favors, that pushes him toward, the action." *Hansan v. U.S. Dept. of Labor*, 400 F.3d 1001, 1006 (7th Cir. 2005). The evidence shows that Officer Miller inadvertently failed to take Mr. Reed's personal property into Branchville. This is evidenced by his efforts to mail the envelope to Mr. Reed later that day.[10] Such conduct does not show that Officer Miller was motivated by Mr. Reed's threat to dispose of his property.

The motion for summary judgment is **granted** with respect to Mr. Reed's claim of retaliation against Officer Miller.

### V. Conclusion

The defendants' motion for summary judgment, Dkt. No. 57, is **granted**. The plaintiff's motion in opposition to motion for summary judgment, Dkt. No. 85, is **denied**. The plaintiff's motion for extension of time to file a surreply, Dkt. No. 97, is **denied**. The Court previously granted him two extensions of time to file a surreply. Dkt. No. 94; Dkt. No. 96. In the second order granting Mr. Reed time to file a surreply, the Court gave him through June 1, 2018, and warned him that no further extensions would be granted.

Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED**.

---

[10] Mr. Reed stated that he had a bag containing his possessions and an envelope containing his legal papers. Officer Miller states that he forgot to drop the small envelope containing Mr. Reed's documents/papers and/or possessions and then mailed them to him at Branchville. Dkt. No. 58-5, p. 4. Whether there was a bag and an envelope or just an envelope is a dispute of fact. However, it is not a material dispute because Mr. Reed cannot show that Officer Miller's failure to deliver Mr. Reed's possessions (that he later mailed to Mr. Reed) when he dropped Mr. Reed at Branchville was prompted by Mr. Reed engaging in any protected activity. A material fact is one that might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Date:6/8/18

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Distribution:

ANTHONY W. REED
930206
PUTNAMVILLE - CF
PUTNAMVILLE CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Donald B. Kite, Sr.
don.kite@gmail.com